Hitchcock, C. J.
These cases are alike in substance, and were argued and submitted by counsel as involving the same principles. The policies of insurance are alike, although of different dates. They were effected upon the same boat, and for the benefit of the same individual. The same testimony was offered in each case, the same points were made, and ruled substantially alike in each case, and in each the verdict of the jury was in favor of the insured.
There is some difference, however, in the charge of the court, upon one particular point in the two cases, and perhaps a slight difference in the ruling as to the testimony. Whether this difference is such as to require of this court to decide the cases differently, is a question to be considered; This difference is not adverted to by counsel, if it has been even perceived by them.
The general facts of the cases are these; The risks upon the “ Olive Branch” were taken at the times, and for the amounts stated in the declarations. This is apparent from the policies, which arc made part of the bills of exceptions. The bills further show that the boat left St. Louis on a voyage to New Orleans, about August 7, 1846, with a cargo on board ; that her draft, with the cargo on board, when she left St. Louis, was about six to six and a half feet. At the time, the water was low in the river, and with the cargo on board, the boat could not pass some of the bars, and in order to get over them, the captain and crew were compelled to lighten her by taking out portions of the cargo. She- *188 •was detained at Turkey Island some three days, at'which point a part of the cargo, consisting of lead, was taken out, and, by so lightening, her draft was reduced to from five and a half to six feet. Subsequent to this, she rubbed upon some of the bars, and ■occasionally upon logs. Her progress was slow, and she did not arrive at the place where lost until somewhere from the 15th to the 17th of August; at *which time, at about eleven o’clock at night, she was run upon a reef of stumps and logs, opposite the mouth of the Bordeaux chute, and was lost. The testimony as to the depth of water upon the bars is not very definite. The captain ■of the boat states the water was very low in the upper Mississippi; that below the mouth of the Ohio there was seven feet in the lowest places, which he considers very low for that part of the river. At the point where the accident happened, there was in ■the channel a sufficient depth of water, and no particular difficulty in the navigation; but the boat was some distance from the proper channel when she was run upon the logs. She is proved to have been staunch, sound, and seaworthy, when she left St. Louis, and there is no evidence of any injury done to her before the accident which occasioned her loss. It is possible, perhaps probable, that she might have been strained and injured somewhat in rubbing' upon bars and logs.
The evidence was offered to prove that the officers and crew were competent, and these, so far as examined, concur in testifying that, after the accident, everything was done, which, according to their judgment, could have been done, to save the cargo and relieve the boat, but they state it to have been their opinion, from the time of the accident, that there was no possibility of saving her. Witnesses were examined, on the part of the plaintiffs in error, to induce the belief that it was owing entirely to negligence and carelessness, that the boat was not relieved from her dangerous situation after she struck. Indeed, one witness, who was a passenger on board, states it as his opinion, from what he saw of the conduct of the officers and crew, that the boat was intentionally run upon the logs; that no efforts were made to get her off, and that he believed the design to have been to charge the insurers with the loss. The captain of the boat, however, and the other officers examined, say, expressly, that they did not, at the time of the loss, know that the boat was insured, and did not learn that fact until some time afterward.
*189 Such are the.leading facts in the cape as set forth in the bills of exceptions.
*The defense relied upon by the insurance companies, was that the boat was unduly loaded, that she was unseaworthy, and that the insured and his agents did not use every practicable effort for the safety and preservation of the boat, at the time of the accident and loss.
On the trials, a witness was introduced by defendants below, by the name of Charles Ross, who had been á pilot upon the river, and who seems to have been acting as.the agent of said defendants below to prepare said eases for trial. He was acquainted with the river; had seen the wreck of the Olive Branch about two weeks after the loss. He stated how pilots usually run; that the descending boats are not usually very particular there, because of the depth of the river and width of the channel; that when he first saw the wreck, he was not nearer than four hundred and fifty yards from her; that boats might run within seventy-five yards and be safe.
The plaintiffs in error then propounded this question to the witness: “ State your opinion, from your knowledge of the character of the navigation of that part of the river, whether or not a boat descending the river, could be run to the place where the Olive Branch was when you saw her, by a competent, sober pilot, if awake, without criminal neglect or fraud.” The question was objected to, and the objection was sustained. In this it is claimed that the court erred.
It is difficult to conceive what object the party had in view in propounding this question. If the object was to enable the jury to infer from the answer that there had been neglect on the part of the pilot, such neglect could not excuse the underwriters. If it was to enable the jury to infer that the pilot was not awake, such fact would not excuse the underwriters.(1) If the object was to prove that fraud had been committed, this ^certainly was not a legitimate mode of proving the fact of fraud. If the object *190 was to induce the jury, contrary to all the evidence in the case, to believe that the pilot was not competent, it was a singular mode of proving incompetency.
The question is not based upon any hypothetical state of facts> bet upon the defendant’s “ knowledge of the navigation of that part of the river, and from this knowledge, he was called upon to state whether a boat could, under any possible circumstances, by night or by day, in time of storm, when affected by the force of wind or otherwise, be run to the place where she was wrecked by a competent, sober pilot, if awake, without criminal neglect or fraud.”
The witness might have answered the question, and have answered in accordance with the wishes of the plaintiffs in error, hut we think he was properly precluded from doing it, and in sustaining the objection the superior court did not err. The witness stated that he had heard the testimony as to the position of the boat on the logs, and as to that part of the river where the disaster happened, and further, that he had never heard of such a man as Hunt, who was pilot of the boat at the time of the loss, before that loss occurred.
This question was then propounded to the witness: “ Ou the facts in proof in this case, as to that part of the river where, and as to the night, and running of the Olive Branch when the accident happened, what is your opinion as to the competency of the pilot at the wheel ?”
This question was objected to and the objection sustained.
One of the questions involved in these cases was as to the competency of the pilot. This was a question for the jury. Upon this point there had been testimony, and the witnesses acquainted with the pilots had generally, if not universally, ^stated that they were good and competent pilots. This witness is then called upon to give his opinion of'their competency, not upon a hypothetical case stated, not upon an agreed state of facts, but from what ho had heard of the testimony in the particular case. He must then, as a juror, ascertain the state of facts from the evidence, conflicting as it was, and from the opinion which he formed *191 of what the facts really were, draw his conclusion as to the competency or incompeteney of the pilots. This would be carrying the doctrine of permitting experts to testify and express their opinions upon particular matters, upon which they are called upon to speak, to a dangerous length. This doctrine was carried to the utmost extent it could be, in the case of the Steamboat Clipper v. Linus Logan, 18 Ohio, 375, with any kind of safety. But that case was materially different from this.
Admitting that Ross, as an expert, could be permitted to express bis opinion, it must be upon a hypothetical state of facts, or in a case where there was no contradiction of facts relative to the subject matter upon which ho was called to speak. In the case against the Cincinnati Mutual Insurance Company, the court seems to have admitted that upon a hypothetical case, he might express bis opinion.
As the question was propounded, we think the court very properly sustained the objection which was taken to it.
The plaintiffs in error then propounded the following question to the witness Ross: “State whether, since you have heard of Hunt, you have learned what was his reputation and character for sobriety, or drunkenness, at the time of this occurrence; if yea, state what that reputation and character was.”
This question was objected to, and the court would not permit it .to bo answered. This is complained of as error.
It is not readily perceived how the general character or reputation of Hunt was put in issue in this case; but if it was, it should bo proven by those who were acquainted with him and his reputation at the time, or before the time, of the disaster, *not by one who never heard of him before, but'might, by possibility, have heard evil reports of him after that disaster.
In the case against the Firemen’s Insurance Company, a witness by the name of McDonald was examined, and he was called upon, by plaintiffs in error, to state his opinion upon a particular point, from what he had heard of the testimony in the case, substantially, as was Ross in the second interrogatory propounded to him. This was not permitted by the court, and we think in thi3 the court ruled correctly.
These are all the points upon which it is claimed that the superior court erred in its rulings as to the testimony. In the opinion of this court, there was no error in those rulings.
*192 The testimony being closed, the counsel for plaintiffs in error requested the court to charge the jury, “that if the Olive Branch was loaded so as to draw mor.e water than there was in the river, such overloading made her unseaworthy; and if such overloading contributed to the loss, the plaintiff can not recover; that if the jury shall find she was so overloaded, she was, in the language of the policy, “ unduly laden,” and the plaintiff can not recover for a loss arising therefrom.
The court refused to charge as requested; hut did charge “that if the boat was laden deeper than her capacity would safely allow, then she would be unseaworthy and unduly laden, not otherwise.’r At least such was the charge in the case of1 the Cincinnati Mutual Insurance Company.
That the overloading a vessel renders her unseaworthy, there can be no doubt, and being thus unseaworthy when she starts upon her voyage, if she is lost, no matter from what cause, the insurers are discharged, as the policy never attached. But the question raised between the superior court and the counsel for plaintiffs in error, is, whether the loading is to be controlled by the capacity of the vessel or the depth of the water over which the vessel is to float. The court' say that the capacity of the vessel is to control. If she is not loaded beyond her capacity, she is not, in contemplation of law, unseaworthy on- ^account of her loading. Counsel seem to admit this to be sound law enough, so far as concerns vessels navigating the ocean, but insist that in navigating the western waters a different rule must prevail. That here we must not look so much to the capacity of the vessel as to the depth of the water in our rivers—not the depth of water in the rivers generally, but the depth upon shoals and bars. It is urged, in favor of this construction, that there is a clause in these policies that the company shall not be liable “for damage or loss arising from, or caused by, the said steamboat being unduly laden during the continuance of the policy,” etc. It is said that in usiug the word unduly, something more was meant than what the law implied, without that provision.
Suppose we consider for a moment the consequences which would follow from adopting the construction which is contended for by plaintiff’s counsel. As a matter of the fact, we know that there is a great difference in the depth of our rivers at different seasons of the year. In times of flood the waters are deep; in times of *193 drought they are very shoal. At one time a boat may bo loaded to her full capacity, and she will be within the terms of a policy of insurance. At another time she may not be loaded within two or three feet of her capacity, and she will not be within the same policy, because there may be shoals and bars over which she can not pass without rubbing upon the ground. A boat might bo loaded at New Orleans with a full cargo, and start on a voyage for St. Louis while the water in the lower Mississippi was in good navigable order, and might be lost before she left that part of the river, and still, if it could be shown that when she left Now Orleans the water in the upper part of the river was so low that she could not have passed the shoals and bars without grounding, the loss would not have been within the same policy. She might have been loaded within her own capacity, but not within the capacity of the river for the whole length of the voyage; therefore she was unsoaworthy from the commencement of the voyage, and the policy did not attach.
*It seems to the court that this will not do, and that the only sensible constniction to the terms “overloading” or “unduly laden ” is that given by the superior court—that it relates to the capacity of the boat, not to the capacity of the river.
But it is said that the judge erred in his charge in this: that he said, “if she was laden deeper than her capacity would allow, she was unsoaworthy, and not otherwise.
The language of the judge is not correctly quoted. As it was used in the case against the Cincinnati Mutual Insurance Company, it was this: “ If the jury should find that the boat was laden deeper than' her capacity would safely allow, then she would be unseawortby and unduly laden, and not otherwise.” The last words clearly have reference to the loading of the boat.
In the case against the Firemen’s Mutual Insurance Company, the language used in this part of the charge is different. The request to charge is the same, but the language of the court is as follows: “ If the Olive Branch was so loaded as to draw more water than there was in the river, such act of overloading was one of carelessness on the part of the officers and crew, and any loss consequent thereupon was within the risk insured against, and covered by the policy ; but if the boat had been loaded beyond her capacity, or so as to sink her below her guards, she would therefore have been rendered unseawortby.”
*194 This language is not as clear and explicit as it might have been, but still it is easily understood, and is consistent with the charge in the other ease. The ideas conveyed are these: If the boat was loaded beyond her capacity, she was unseaworthy. Had she been loaded so as to sink her below her guards, she would have been unduly laden, and therefore unseaworthy ; but if she was so deeply laden as to make the navigation difficult, but still was loaded within her capacity, it was an act of carelessness on the part of the officers and crew, and any loss consequent thereon would have been covered by the policy.
In such case the vessel would be seaworthy so far as the loading was concerned, but tbero would have been more loading *than prudence dictated; but so long as she was seaworthy, the insurers would be liable for any loss.
So far as this charge is concerned, we do not, in either case, discover any error.
The policies contain this .clause: “ And in case of loss or misfortune as aforesaid, it shall be the duty of the assured, their agents or assigns, to use every practicable effort for the safeguard and recovery of the said steamboat, and if recovered, to cause the same to be forthwith repaired; and in case of neglect or refusal on the part of the assured, their agents or their assigns, to adopt prompt and efficient measures for the safeguard .and recovery thereof, the said insurers are hereby authorized to interpose and recover said steamboat, and cause the same to be repaired for account of the assured.”
The court charged the jury, “ That this clause rendered the assured no more and no loss responsible for the negligence of the officers and crew of the boat, in saving the boat after the disaster, than he would have been if no such clause had been inserted.”
In this it is claimed that the court erred.
In the opinion of the superior court, the insertion of this clause added nothing more to the responsibility of the assured, so far as the negligence of the officers and crew in saving the boat after the disaster was concerned, than would have been imposed upon him without any such clause. The disaster has happened which was insured against, and after this, after the insurer is liable to a partial or total loss, as the case may bo, the assured or his agents are bound by this clause to use efforts to recover and save the boat, *195 and get her repaired ; and if they neglect, the insurer may do it and charge the assured with the expense. To determine whether the opinion expressed by the court to the jury is correct, it is necessary to ascertain what are the duties of the assured, his agents, etc., in case of a disaster like the one which happened in the cases under consideration.
This clause is said to be different from those inserted in the ^Atlantic policies. In these latter, the corresponding clause is, “ In case of any loss or misfortune, it shall be lawful for the assured, their factors, agents, servants, etc., to sue, labor, and travel for, in or about the defense, safeguard and recovery of the said goods or ships, without prejudice to this insurance.”
Now, this last-recited clause added nothing to the duties of the assured or his agent, in ease of loss. It was inserted, as it seems, so as to save to the insured a right to abandon, where he or his agents shall, after a disaster, have made efforts to recover and save the vessel and cargo. It was inserted for the benefit of the insured, not of the insurers. It does not vary or change the duties of the party. “ Without this clause,” says Marshall, “ the insured is bound, in justice, honor, and conscience, to use his utmost endeavors to make the most of what may be rescued from destruction, in order as much as possible to lighten the burden of the insurers.” 2 Marsh. Ins. 614.
It is claimed, however, that the insertion of the clause which has been referred to in the policies now before the court, imposes an express obligation on the insured, which before was only implied, and that it is to be treated as a warranty, which if not fulfilled will avoid the policy. Such was not the opinion of the Supreme Court of New York as expressed in the case of Gardere v. Columbian Insurance Company, 7 Johns. 514. In that case, the policy contained the usual clause, with this change: after the word “lawful,” the words “and necessary” were inserted, so that the reading was “ it shall be lawful and necessary for the assured,” etc. The judge, in delivering the opinion of the court, says, “ Previous to this alteration, the construction of the above clause was well understood; and I can discover no substantial reason why the insertion of the word “ necessary ” should so essentially alter the construction as to create a different operation. It imposes no additional duties on the master. He was before bound to labor diligently for the recovery of the property, and to alleviate the burdens of the *196 insurer. This is a well settled rule,” etc. *In the case before us, more words are used than in the clause in the New York case; still, in that caso, the insertion of the word "necessary” included, iu its legal effect, all that is included, or insisted upon as being included, in the present policies. If so, then it follows, if the court of New York was right, and we think it was, that no additional duties were imposed upon the insured 'by the insertion of this clause, and the superior court very properly so instructed the jury.
This clause in the policy, although it imposes no additional duty upon the insured, secures to the insurers the privilege after a disaster, if the insured shall not labor faithfully to recover and repair the boat or vessel, of doing it themselves and of charging the expenditures to the assured. And they may do this without being charged with having accepted an abandonment.
In the opinion of this court, the superior court did not err in. the charge to the jury.
The last error assigned is, that the superior court refused to grant a new trial. If that court did not err in its rulings upon the testimony, nor in its charge to the. jury, no new trial should have been granted on either of these accounts. And the only remaining question is, whether the verdict was against the evidence. We have examined the testimony as it appears in the bills of exceptions, and it seems to us that instead of its being against tho verdict it fully sustains it, and the superior court very correctly overruled the motion for a new trial.
The judgment of the superior court, in both cases, is affirmed with costs.

 By a policy of insurance, the assured makes no warranty to the underwriters that the master and crew shall do their duty during the voyage; and their negligence or misconduct is no defense to an action on the policy, where the loss has been immediately occasioned by the perils insured against; nor *190 can any distinction be made in tbis respect between tbe omission by the master and crew to do an act which ought to be done, and the doing an act which ought not to be done, in the course of tbe navigation. Broom’s Legal Maxims, 388, citing Dixon v. Sadler, 5 M. & W. 414; 11 Ohio, 147; 11 Peters, 213.